# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SHIRLEY M. NASH
        **Plaintiff,**

    **v.**                                 **Case No. 10-C-353**

MICHAEL J. ASTRUE,
**Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Shirley Nash applied for social security disability benefits, alleging inability to work as of April 24, 2006, due to breast cancer and the residuals of her treatment therefor, including fatigue; diabetes; back, shoulder, and foot pain; osteoarthritis; and depression. (Tr. at 115, 120, 132, 137, 172, 188.) The Social Security Administration ("SSA") denied the application initially (Tr. at 74, 75) and on reconsideration (Tr. at 76, 77), as did an Administrative Law Judge ("ALJ") following a hearing (Tr. at 9-17). After the Appeals Council denied plaintiff's request for review (Tr. at 1, 192), the ALJ's decision became the agency's final determination on plaintiff's application. See 20 C.F.R. § 404.981; Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). Plaintiff now seek judicial review of the ALJ's decision.

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

Under 42 U.S.C. § 405(g), the reviewing court will reverse if the ALJ's decision lacks the support of "substantial evidence" in the record, is so poorly articulated as to prevent meaningful review, or is based on legal error. See, e.g., Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698

(7th Cir. 2009). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Castile v. Astrue, 617 F.3d 923, 926 (7th Cir. 2010); Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009). Under this deferential standard, if reasonable people could differ as to whether the claimant is disabled, the ALJ's decision to deny the claim will be upheld. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

But deferential review is not "abject." Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). The court reviews the entire record, including both the evidence that supports as well as the evidence that detracts from the ALJ's conclusions, see Young v. Sec'y of Health and Human Services, 957 F.2d 386, 388-89 (7th Cir. 1992), thus ensuring that the ALJ considered all relevant evidence rather than "simply cherry-pick[ing] facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010). If on its review the court finds that the ALJ ignored important evidence or failed to build an accurate and logical bridge from the evidence to the result, the case will be remanded. See, e.g., Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009). Because judicial review is limited to the reasons provided by the ALJ in her decision, the Commissioner's lawyers may not fill in any gaps in the ALJ's reasoning. See, e.g., Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010); see also Spiva v. Astrue, No. 10-2083, 2010 WL 4923563, at *6 (7th Cir. Dec. 6, 2010). Finally, if the ALJ commits an error of law, such as violating agency rules for evaluating disability claims, see Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991), the court will reverse without regard to the volume of evidence in support of the factual findings, White v. Apfel, 167 F.3d 369, 373 (7th Cir.1999); Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

**B.    Disability Standard**

Disability is determined under a sequential, five-step test. See 20 C.F.R. § 416.920(a)(4).  Under this test, the ALJ asks (1) whether the claimant is unemployed; (2) if so, whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner as presumptively disabling;[1] (4) if not, whether the claimant can, given her residual functional capacity ("RFC"), perform her past relevant work; and (5) if not, whether the claimant is capable of performing other work in the national economy.  See, e. g., Simila v. Astrue, 573 F.3d 503, 512-13 (7th Cir. 2009).

The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the agency to show that the claimant can make the adjustment to other work.  See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The agency may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of her limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education, and work experience.  However, the ALJ may not rely on the Grid and must consult a VE if the claimant's vocational factors and RFC do not coincide with the criteria of a particular Grid rule or if the claimant otherwise suffers from significant non-exertional impairments.  See Haynes v. Barnhart, 416 F.3d 621, 627 (7th Cir. 2005); Herr v. Sullivan, 912 F.2d 178, 181 n.3 (7th Cir. 1990); Neave v. Astrue, 507 F. Supp. 2d 948, 953 (E.D. Wis. 2007).

_____

[1]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

## II. FACTS AND BACKGROUND

### A.    Treatment Records

Plaintiff initially received her primary care from Dr. Kim Merriman, whom she saw for a variety of matters, including a finger abrasion she suffered at work (Tr. 222), bronchitis (Tr. at 223-24), and follow-up after a knee injury (Tr. at 225, 227, 229, 231).  Dr. Merriman also followed plaintiff's diabetes.  (Tr. at 221.)

On August 29, 2005, plaintiff visited St. Mary's Hospital complaining of knee pain and left elbow pain after tripping and falling at work.  X-rays were negative, and she was provided ibuprofen and an ice pack.  (Tr. at 209-11, 249-52.)

On December 10, 2005, plaintiff again visited St. Mary's Hospital, this time complaining of left shoulder pain and decreased range of motion.  Dr. Raymond Wallace prescribed Motrin and Vicodin and advised plaintiff to use a heating pad as needed.  (Tr. at 207-08.)

In February 2006, plaintiff found a lump in her breast and, following a suspicious mammogram, underwent a biopsy on March 29, 2006, which revealed malignancy.  (Tr. at 198-200, 204, 281.)  On April 27 and May 11, 2006, Dr. Anthony Linn performed left breast lumpectomies.  (Tr. at 246, 276-77, 338-39.)  Plaintiff subsequently underwent radiation therapy with Dr. Charles Tiber, which she completed on August 30, then started on the drug Tamoxifen.[2]  (Tr. at 268, 279, 280, 286-88, 333.)  A June 27, 2006, mammogram revealed benign findings.  (Tr. at 260.)

On July 24, 2006, plaintiff underwent a routine physical exam by Dr. Merriman, who

---

[2]Tamoxifen is a drug used to treat breast cancer  and to reduce the risk of breast cancer in women who are at increased risk of developing the disease.  <u>See</u> http://www.cancer.gov/cancertopics/factsheet/Therapy/tamoxifen.

noted plaintiff to be poorly compliant with her insulin regimen. Dr. Merriman further noted that plaintiff drank moderate to heavy amounts of alcohol, based on family reports. Plaintiff complained of trouble sleeping, weakness, and blurry vision. Dr. Merriman increased her insulin dosage (Tr. at 271) and wrote a note stating, "Due to health problems, this [patient] is now permanently disabled." (Tr. at 261.)

On August 4, plaintiff returned to Dr. Merriman, with her blood sugar under better control with the increase in insulin. (Tr. at 269.) During a September 25 appointment with Dr. Merriman, plaintiff complained of low energy, chronic leg and back pain, and depression, despite the good prognosis related to her cancer. Plaintiff further stated that she "wants to be retired from work," "does not feel physically or mentally prepared to handle work on a regular basis," and has "a disabled child at home." (Tr. at 268.)

On September 1, plaintiff saw Dr. Ranjini Gandhavadi, having completed her course of left breast irradiation. She continued to have palpable induration around the lumpectomy area, and he advised her to continue skin care. (Tr. at 332.) Plaintiff returned to Dr. Gandhavadi on October 3, doing well but with continued sensitivity around the lumpectomy scar and very limited range of motion of the left shoulder. Dr. Gandhavadi advised her to resume physical therapy. (Tr. at 331, 512-13.)

On October 30, plaintiff underwent a lumbar MRI, which revealed lumbar degenerative disc disease, most pronounced at the L5-S1 level, very mild L5-S1 circumferential disc bulging with additional small left posterior L5-S1 disc protrusion, as well as mild L5-S1 facet arthropathy, showing borderline corresponding spinal canal stenosis but without significant compromise of the nerve roots within the spinal canal. (Tr. at 510-11.)

Plaintiff returned to Dr. Tiber on November 6, doing well with no symptoms of recurrence

5

of malignancy. She did complain of fatigue and chronic back pain, which were treated by her family doctor. (Tr. at 329.)

On January 31, 2007, plaintiff saw Dr. Jonathan Marquez, her new general physician, for a checkup. Plaintiff noted her past medical history of diabetes, for which she was prescribed insulin, but which she had not taken for almost two weeks; breast cancer, for which she had not seen her oncologist for several months due to insurance problems; chronic low back pain, for which she took Percocet; and migraine headaches, for which she also took medications but with no recent attacks of headache, nausea, vomiting, or photophobia. (Tr. at 444.) On exam, she had full range of motion of both upper and lower extremities, and motor strength was 5/5 on both upper and lower extremities with intact sensation. However, Dr. Marquez noted that her diabetes was uncontrolled and advised her on proper compliance with medications. (Tr. at 445.) Regarding her low back pain, Dr. Marquez provided a limited supply of Percocet and told her to bring her records from her old physician and to avoid lifting heavy objects. He continued her migraine medication and suggested a referral to a podiatrist regarding a cyst on her left foot. (Tr. at 446.)

On February 14, plaintiff returned to Dr. Marquez regarding her left foot cyst, which caused occasional discomfort. Dr. Marquez referred her to a general surgeon for possible removal and advised her to take over the counter pain medication as needed. (Tr. at 327, 442.) Dr. Marquez again noted plaintiff's uncontrolled diabetes and advised her of the importance of proper compliance with medications. He also referred her to a new oncologist. Plaintiff again requested a refill of the Percocet prescription she had received from her previous physician for low back pain; Dr. Marquez required that she obtain the records from her previous physician before he refilled the prescription. (Tr. at 328, 443.)

On February 19, plaintiff saw Dr. Abdul Arif regarding her diabetes. Dr. Arif advised her to continue on Lantus and increase Humalog. (Tr. at 440-41.) Plaintiff returned to Dr. Arif on February 29 and was again advised to increase her medication dosage and to check her blood sugar regularly. (Tr. at 325-26.)

On March 7, plaintiff established continuation of her breast cancer care with Dr. Abhay Jella. (Tr. at 372.) Plaintiff complained that ever since her diagnosis she had significant tiredness and fatigue. She also stated that her whole body ached and reported using pain medication off and on. (Tr. at 372.) Dr. Jella continued Tamoxifen for five years from September 2006 onward and recommended annual mammograms.[3] (Tr. at 375.)

Plaintiff returned to Dr. Marquez on April 17, complaining of low back pain and depression. She stated that the back pain had continued for several months, and that for the last few weeks she noticed some tingling and numbness occasionally in both lower extremities. She also reported depression, for which she had been treated with Paxil before, but she ran out of medication in the last few months. She denied suicidal ideation but stated that she had been feeling more tired and lacked energy to do her daily activities. (Tr. at 436.) Dr. Marquez referred her for an MRI regarding her low back pain. Because plaintiff also reported some tingling and numbness in her upper extremities, he ordered a cervical spine MRI as well, but noted that her neurological exam showed no significant abnormal findings. He also restarted her on Paxil for depression and referred her to a podiatrist for further evaluation and management of her left foot. (Tr. at 437.)

On April 19, plaintiff underwent an MRI scan of the cervical spine, which revealed a

---

[3]Follow-up mammograms completed on March 21, 2007, September 21, 2007, and March 25, 2008, were stable. (Tr. at 341, 344, 346, 402.)

minimum posterior disc bulge at C4-5, with no evidence of disc herniation, and a posterior disc bugle at C5-6, with no evidence of disc herniation, and an MRI of the lumbar spine, which revealed minimal dessication of the L5-S1 disc, with no evidence of disc herniation.  (Tr. at 413.)

On April 25, plaintiff returned Dr. Marquez, complaining of cough and chest pain on coughing.  (Tr. at 438.)  Dr. Marquez diagnosed acute bronchitis and prescribed Azithromycin. Regarding her depression, plaintiff noted that her insurance did not cover her Paxil prescription, so Dr. Marquez switched her to fluoxetine.  (Tr. at 439.)  Plaintiff saw Dr. Marquez on May 4 related to her back and neck pain.  Dr. Marquez reviewed the MRI results, which revealed minimal problems, and provided a referral to a physical therapist and pain management specialist.  He continued her on the same medication regimen for diabetes.  (Tr. at 435.)  On May 25, Dr. Marquez wrote a letter stating that plaintiff "continues to have chronic low back pain and I have recommended that she refrain from any strenuous physical activity which may further aggravate her condition for the next three months until she finishes physical therapy [and] is evaluated by the pain management specialist."  (Tr. at 433.)

In May and June 2007, plaintiff underwent physical therapy with Milan Grbic for her neck and back pain.  During the initial evaluation, she reported pain at a level of 8 on a 1-10 scale throughout her entire body.  She used pain medication, which helped minimally.  She reported inability to comfortably sleep and walk based on the pain radiating into her upper and lower extremities.  She was using a cane but requested a walker.  On exam, her neck range of motion was reduced to 30% of normal and her lumbar range to 35-40% of normal. Functionally, she could ambulate with her cane for only five minutes.  Grbic noted that the cane was too tall for her and recommended a rollator/walker.  (Tr. at 475.)

8

Plaintiff returned to Dr. Marquez on May 25 regarding her low back pain, foot pain, and cough. Plaintiff reported that she had started physical therapy, which helped with her symptoms. (Tr. at 430.) Dr. Marquez advised her to continue therapy and again provided a referral to a pain management specialist, as she had missed her previous appointment. She had also missed her appointment with the podiatrist, so Dr. Marquez made another referral regarding plaintiff's left foot pain. Regarding her cough, Dr. Marquez told her it was most likely related to her chronic smoking and advised her to quit, but she was not ready to do so. (Tr. at 431.)

Plaintiff next saw Dr. Marquez on June 18, still complaining of foot pain. She had been referred to a podiatrist but again missed the appointment. However, she reported that her left foot pain was getting better with the medications provided by her pain management physician, Dr. Primo Tamayo. (Tr. at 428.) Dr. Marquez told her it was important that she follow up with the podiatrist since she kept missing the appointment. (Tr. at 429.)

On July 6, plaintiff saw Dr. Tamayo, complaining of headache, neck pain radiating to the left shoulder, and low back pain radiating to the legs. She rated her pain 3 on a 0-10 scale with medications, 7 without. (Tr. at 478.) On exam, Dr. Tamayo noted tenderness on palpation of the lower back, and decreased response to tactile stimulation of the face. He assessed lumbar spondylosis and peripheral neuropathy, and prescribed Morphine sulfate and Oxycodone. (Tr. at 479-80.)

Plaintiff returned to Dr. Jella on July 10, with the same complaints as in her previous visits. (Tr. at 369.) Dr. Jella continued Tamoxifen and noted that plaintiff was followed by a pain doctor related to her chronic aches and pain of unclear etiology. (Tr. at 371.)

Plaintiff saw Dr. Marquez on July 30, complaining of migraine headaches, low back pain,

9

diabetes, and rectal bleeding.  She also requested that Dr. Marquez complete paperwork for her disability claim since she had chronic low back pain.  She denied any weakness, numbness, paresthesia, or incontinence.  (Tr. at 426.)  Regarding the rectal bleeding, Dr. Marquez referred plaintiff to gastroenterology for a possible colonoscopy;[4] he also provided a prescription for migraines, advised her to follow-up with her pain management specialist for her low back pain, and provided Wellbutrin to help with smoking cessation.  (Tr. at 427.)

Plaintiff saw Dr. Tamayo on August 3, continuing to complain of headache and low back pain, which she rated 2 on a 0-10 scale with medications.  (Tr. at 481.)  On exam, he noted muscle spasm of the shoulders.  He assessed osteoarthritis of the shoulder, lumbar spondylosis, and continued medications.  (Tr. at 482-83.)

Plaintiff returned to Dr. Marquez on August 13 for follow-up of her diabetes and cholesterol problems.  She reported good compliance with medications but had not been very careful with her diet and exercise.  (Tr. at 562.)  Dr. Marquez increased her insulin dose.  (Tr. at 563.)

On August 27, plaintiff saw Dr. Arif regarding her diabetes.  On exam, he noted no tenderness of the cervical, dorsal, or lumbar spine, and her gait was normal.  However, her diabetes remained uncontrolled, and the doctor increased her insulin dosage.  (Tr. at 561.)

On September 5, plaintiff saw Dr. Tamayo, who continued pain medications.  (Tr. at 484-85.)  On October 5, after noting pain on shoulder motion, Dr. Tamayo assessed supra-scapular nerve entrapment on the left and prescribed a supra-scapular nerve block.  (Tr. at 486-87.)  On

---

[4]On August 8, 2007, plaintiff saw Dr. C.M.M. Sundaram, who recommended an endoscopic evaluation.  (Tr. at 564-65.)  The record does not contain the results of such test, if it was ever performed.

December 10, Dr. Tamayo noted that plaintiff's symptoms were controlled on her current medications with 65% relief. (Tr. at 488.)

On October 10, plaintiff saw Dr. Minhaz Karim at the walk-in clinic for a refill of her insulin, which ran out two days previously. Dr. Karim noted her non-compliance with medications. (Tr. at 559-60.) She followed up with Dr. Karim on October 22, and he recommended a new insulin dosage regimen. (Tr. at 556-57.)

Plaintiff returned to Dr. Marquez on November 27, complaining of shoulder and foot pain, and headaches. (Tr. at 554.) On exam, Dr. Marquez noted full range of motion of both upper and lower extremities, but slight tenderness to palpation over the dorsum of the left foot. Dr. Marquez provided a referral for a left foot MRI, a prescription for Percocet for the left shoulder, and advised her to bring a record of her blood sugar readings to the next visit. He also refilled her headache pills. (Tr. at 555.)

On December 4, plaintiff saw to Dr. Marquez regarding her shoulder pain, which had worsened after she slipped and fell. She was unable to move her left shoulder due to the severe pain, and Percocet provided only minimal relief. Dr. Marquez provided Tynenol # 3 to be used along with Flexeril. He also suggested an MRI and told her to avoid lifting heavy objects or strenuous physical activity. (Tr. at 553.) On December 8, plaintiff underwent MRI scans of her left foot and left shoulder, which were normal. (Tr. at 404.)

Plaintiff returned to Dr. Jella on February 13, 2008, continuing to complain of fatigue since her radiation treatment (Tr. at 365), and he continued treatment as before (Tr. at 367). Again on April 9, plaintiff saw Dr. Jella, complaining of significant fatigue since her diagnosis, worse since the radiation. She also complained that her whole body ached. (Tr. at 361.) She was continued on Tamoxifen and advised to follow-up with her primary doctor regarding her

chronic aches and pain of unclear etiology.  (Tr. at 363.)

On April 7, plaintiff saw Dr. Marquez regarding her diabetes, back pain, foot pain, and shoulder pain.  (Tr. at 551.)  On exam, Dr. Marquez noted full range of motion of upper and lower extremities, motor strength 5/5 on both upper and lower extremities, and no spasm or tenderness of the back, with negative straight leg raise test.  Dr. Marquez advised her to follow up with Dr. Tamayo for pain management and offered to refer her to physical therapy but she declined.  He also ordered x-rays of her left thumb and shoulder (Tr. at 552), which came back normal (Tr. at 401).

On April 9, plaintiff returned to Dr. Tamayo, who noted 50% relief of pain symptoms with medication.  Plaintiff rated her pain 4 on a 0-10 scale while on her prescribed pain medications.  (Tr. at 491.)  Dr. Tamayo assessed osteoarthritis of the shoulder, hand, and ankle/foot, along with lumbar spondylosis; continued Morphine sulfate and Oxycodone; added Naproxen; and ordered another injection to the left shoulder.  (Tr. at 492-93.)

On April 10, plaintiff returned to Dr. Marquez for follow-up of her blood work, and she admitted not being compliant with medications. (Tr. at 549.)  On April 18, she returned regarding left shoulder and right thumb pain.  On exam, she had slight limitation of motion of the left shoulder, and slight tenderness on palpation over the right carpometacarpal joint.  (Tr. at 546.)  Dr. Marquez noted the normal x-rays, but plaintiff continued to complain of significant pain on movement of the left shoulder and right thumb, so Dr. Marquez ordered an MRI for further evaluation of her symptoms.  (Tr. at 547.)  On April 23, plaintiff underwent MRI scans of the right hand and left shoulder, which were normal.  (Tr. at 394.)  Dr. Marquez reviewed the results with plaintiff on May 30.  He found her complaints of continued pain concerning, despite the normal test findings, so ordered an arthritis panel and provided a referral for physical

12

therapy.  (Tr. at 544-45.)

On May 29, plaintiff returned to Dr. Tamayo, reporting 70% relief with her medications. (Tr. at 494.)  He continued her pills and ordered another injection.  (Tr. at 496.)  On June 4, plaintiff saw Dr. Marquez for follow-up of a cholesterol test.  On exam, she had full range of motion of the upper and lower extremities.  Her dyslipidemia was slightly improved, and the doctor advised her to cut down on fatty foods.  (Tr. at 543.)  On June 27, plaintiff again reported 70% relief to Dr. Tamayo, who continued medications.  (Tr. at 497-99.)

Plaintiff returned to Dr. Marquez on June 18 for follow-up of her tests for diabetes and cholesterol.  He advised her to increase her Lantus and continue Humalog.  (Tr. at 541.) Plaintiff also requested headache medication, with Dr. Marquez prescribing Fioricet, and a muscle relaxer for chronic back pain, with Dr. Marquez prescribing Flexeril.  (Tr. at 542.)

In June and July 2008, plaintiff underwent physical therapy with Milan Grbic for her back, right thumb, and left shoulder.  (Tr. at 458-66.)  Grbic noted significantly reduced grip strength on the right.  (Tr. at 469.)

On July 14, plaintiff saw Dr. Marquez regarding her diabetes and high blood pressure, and he again advised her of the importance of proper compliance.  (Tr. at 539.)  Plaintiff returned to Dr. Marquez on July 23, complaining of left shoulder pain and requesting referral to an orthopedic surgeon.  Dr. Marquez noted that the latest MRI showed no abnormal findings, but she continued to have significant left shoulder pain and limitation of movement despite physical therapy.  Upon her request, Dr. Marquez referred her to a surgeon (Tr. at 538), and on July 29, plaintiff saw Dr. Eric Pifel regarding her left shoulder pain.  She reported receiving injections from Dr. Tamayo and therapy through Milan Grbic with no significant improvement. Dr. Pifel assessed left adhesive capsulitis and suggested continued therapy.  (Tr. at 448.)

In July and August 2008, plaintiff underwent physical therapy for her left foot with Milan Grbic. She complained of pain, 7 on a 1-10 scale, increased with prolonged walking, heel raise, or stair climbing. On initial exam, she ambulated independently wearing normal tennis shoes but did weight bear more heavily on the right leg and had diminished stance time/heel toe pattern on the left. She could not unilaterally stand on the left side. (Tr. at 450-56.) Plaintiff returned to Dr. Tamayo on August 22, reporting 70% relief with medications, which were again continued. (Tr. at 503-05.)

## B.    SSA Consultants' Reports

The SSA arranged for plaintiff's claim to be evaluated by two medical professionals. On January 9, 2007, William Merrick, Ph.D, completed a psychiatric review technique form, finding no severe mental impairment. (Tr. at 292.) On January 20, 2007, Dr. Syd Foster completed a physical RFC report, finding plaintiff capable of medium work with no additional limitations. (Tr. at 306-13.)

## C.    Hearing Testimony

Plaintiff testified that she was fifty-one years old and lived with her eight year old son. (Tr. at 23.) She stated that she had a driver's license but rarely drove due to back pain and arthritis; a friend had driven her to the hearing. (Tr, at 24-25.) She completed the twelfth grade in school (Tr. at 25), with previous work experience as an assistant supervisor in food service (Tr. at 27), which primarily involved her supervising other employees as they served food to residents and inmates at county facilities (Tr. at 29). She supervised about six other employees on the food service line but did no hiring or firing. (Tr. at 55-56.) The job required her to be on her feet most of the day and to push carts weighing up to thirty pounds. (Tr. at

14

30.)

Plaintiff testified that she became disabled in April of 2006, when she was diagnosed with breast cancer, and had not worked since then. (Tr. at 25, 31.) She testified that although the cancer had not recurred, she continued to take the medication Tamoxifen. (Tr. at 31.) She stated that she also experienced constant back pain, which she rated 8 on a scale of 1 to 10, and for which she received physical therapy, which helped a little. (Tr. at 32-33.) She also testified to pain in her left foot, on which she had surgery to remove a cyst. (Tr. at 33.) She received physical therapy for that problem too, which helped some, but she continued to experience daily pain. (Tr. at 33-34.) She testified that she used a cane or walker because of problems with her foot. (Tr. at 34.) She also testified to arthritis in her right thumb and wore a splint related to that problem at the hearing. (Tr. at 35.) She further testified to a frozen left shoulder, which caused constant pain. (Tr. at 35-36.) She was also diabetic but not always compliant with her insulin. (Tr. at 36.) She admitted that she used to drink a lot but stopped in 2006 when she got sick. (Tr. at 36-37.) Plaintiff also testified to depression, which she attributed to a difficult divorce. (Tr. at 37.) She received no treatment for depression; her family helped her. (Tr. at 38.) Plaintiff's lawyer provided a list of her medications prior to the hearing (Tr. at 187), and plaintiff denied any side effects (Tr. at 38).

Plaintiff testified that she did little around the house due to pain, weakness, and fatigue; her sister and a friend helped her. She tried to exercise by walking on a treadmill for fifteen minutes. She went to church regularly, with services lasting about one hour. (Tr. at 39-41.) She testified that her son experienced serious medical problems at birth, but by the time of the hearing he seemed to be in relatively normal health. (Tr. at 42-43.)

Plaintiff testified that she could sit or stand for fifteen minutes, and lift about five pounds.

15

(Tr. at 43.)  She testified that she periodically sat in a lounge chair throughout the day.  (Tr. at 44.)  She sometimes needed help dressing or opening jars.  (Tr. at 44-45.)  She testified to problems sleeping due to nerves, restlessness, and pain, and to breathing problems several times per month, apparently attributable to her smoking, for which she used an inhaler.  (Tr. at 45-48.)  She took medication for pain.  (Tr. at 50.)

The ALJ summoned a VE, Allen Searles, who classified plaintiff's work as an assistant supervisor as semi-skilled, medium work (as she performed it),[5] and the dietary aide job she apparently started with as medium, unskilled work (both as she performed it and under the DOT).  (Tr. at 57.)  The ALJ then posed a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to medium work involving frequent but no repetitive overhead reaching with the left arm.  The VE testified that such a person could not, due to the restriction on overhead lifting, perform plaintiff's past work.  (Tr. at 57-58.)  However, the person could perform other jobs at the light level, including mail clerk, counter clerk, and production assembly.  (Tr. at 58.)  If the person required the ability to alternate between sitting and standing, these light jobs would be eliminated.  However, the person could perform sedentary jobs such as order clerk, call out operator, and surveillance system monitor.  (Tr. at 59.)  If the person needed to use a cane, the light jobs would be eliminated but the sedentary jobs would not be affected.  (Tr. at 63.)  If the person could only walk five minutes at a time per hour, the sedentary jobs would not be affected.  (Tr. at 65-66.)  All of the jobs the VE identified were unskilled.  (Tr. at 72.)

---

[5]Under the Dictionary of Occupational Titles ("DOT"), this job was unskilled.  (Tr. at 57.)

16

**D.     ALJ's Decision**

Following the five-step procedure, the ALJ determined that plaintiff had not worked since her alleged disability onset and that she suffered from the severe impairments of status-post surgery and radiation for breast cancer, diabetes, osteoarthritis, lumbar spondylosis, and suprascapular nerve entrapment, none of which met or equaled a Listing.  The ALJ found plaintiff's foot and hand problems and depression non-severe.  (Tr. at 11-14.)  The ALJ then determined that plaintiff retained the RFC for medium work, with no additional limitations.  (Tr. at 14-15.)  In so finding, the ALJ discounted plaintiff's claims of greater limitations as "not entirely credible."  (Tr. at 15.)  Based on this RFC, the ALJ found that plaintiff could return to her past work as an assistant supervisor and dietary aide; in the alternative, and relying on the VE's testimony, she concluded that plaintiff could perform other jobs such as mail clerk, counter clerk, and production assembler.  (Tr. at 16.)  Accordingly, she found plaintiff not disabled and denied the application.  (Tr. at 17.)

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the credibility of her testimony, the physical therapy reports, and her hand, foot, and mental impairments.  Based on these errors, plaintiff contends, the ALJ made a flawed RFC determination and improperly determined that she could return to past work and/or perform other work in the economy.  Because the ALJ committed errors of fact and law in determining credibility, and skipped over important evidence in considering the nature and severity of plaintiff's impairments, I reverse and remand for further proceedings.

## A.    Credibility

The ALJ must follow a two-step process in evaluating the credibility of a social security claimant's testimony.  First, the ALJ must determine whether the claimant suffers from an impairment that could reasonably be expected to produce the symptoms alleged.  If there is no medically determinable physical or mental impairment(s), or if the impairment(s) could not reasonably be expected to produce the claimant's pain or other symptoms, the symptoms cannot be found to affect her ability to work.  SSR 96-7p.

Second, if the ALJ finds that the impairment(s) could produce the symptoms alleged, she must determine the extent to which the symptoms limit the claimant's ability to work.  SSR 96-7p.  In making this determination, the ALJ may not discredit the claimant's statements based solely on a lack of support in the medical evidence.  Moss, 555 F.3d at 561.  "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence."  SSR 96-7p.  The regulations direct the ALJ to consider, in addition to the medical evidence, the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  The ALJ must then provide "specific reasons" for the credibility determination, supported by the

evidence and articulated in the decision. SSR 96-7p.

Because the ALJ has the opportunity to observe the claimant testifying, the reviewing court will generally afford her credibility determination special deference, reversing only if it is "patently wrong." See, e.g., Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010); Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010). However, where the credibility determination is based on objective factors rather than subjective considerations such as demeanor, the court has greater freedom to review the ALJ's decision. Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (citing Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994)). Further, the ALJ's failure to comply with SSR 96-7p constitutes legal error warranting remand. See, e.g., Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003); Koschnitzke v. Barnhart, 293 F. Supp. 2d 943, 952 (E.D. Wis. 2003).

In the present case, the ALJ, after determining that plaintiff retained the RFC for medium work, stated: "In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. at 14.) The ALJ then "discounted" plaintiff's claim of disabling fatigue, noting that the treatment notes "generally only rarely referred to [plaintiff's] actual complaints of fatigue and do not include clinical observations of a tired or weakened appearance." (Tr. at 15.) Regarding plaintiff's complaints of shoulder pain, the ALJ noted that MRI and x-ray scans were normal, and treating physicians often noted full range of motion. (Tr. at 15.) Regarding plaintiff's back pain, the ALJ noted the MRI scans revealed degenerative disc disease, but there were few abnormal examination findings. (Tr. at 15.) Plaintiff reported that she could not sit or stand for more than twenty minutes, and could lift just five pounds, but

19

the ALJ stated that these alleged restrictions were not supported by the medical evidence. The ALJ further noted that plaintiff had previously reported the ability to drive, care for her son, socialize, tend to her personal needs, and take walks; she also enjoyed swimming. (Tr. at 15.) The ALJ also noted that while plaintiff reported the ability to walk for just five minutes with the use of a cane, Drs. Marquez, Tamayo and Pifel never asserted that use of a cane was necessary. (Tr. at 15.) The ALJ concluded:

> In sum, the undersigned concludes that the claimant retains the ability to perform medium work. In so finding, the undersigned finds that the claimant's allegations are not entirely credible. In reaching this finding, the undersigned has considered a variety of factors. For example, as previously noted, the undersigned has considered the objective medical evidence, the opinion evidence, the claimant's complaints, her response to treatment, and her use of medications and other treatment. The undersigned observes that the claimant saw a doctor throughout 2007 and 2008 for diabetes, and those treatment notes show minimal complaints of fatigue, back pain, and depression. The undersigned further notes the claimant indicated that she wants to be retired from work, noting that she had a disabled child at home. She is able to perform a variety of activities, and listed her hobbies as swimming, cooking, and walking. The record further demonstrates that the claimant drank moderate to heavy amounts of alcohol; while she did not confess this to her doctors, her family did. The record also contains numerous references to the claimant's noncompliance with her medications, insulin, and diet.

(Tr. at 15-16, record citations omitted.)

There are several problems with the ALJ's credibility determination. Most serious is the ALJ's failure to follow the required two-step process. Specifically, although the ALJ found several severe impairments, she did not determine, as an initial matter, whether those impairments could produce the symptoms alleged. As discussed above, if the ALJ answers this question in the affirmative, she must evaluate the credibility of the claimant's statements under all of the SSR 96-7 factors and may not reject the allegations simply because they are not born out by the objective medical evidence. Here, the ALJ discounted plaintiff's complaints

20

based primarily on the lack of objective medical support. Because the ALJ did not first determine whether the symptoms could be caused by the impairments, it is impossible for me to review the propriety of that analysis. See Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001) (remanding where the court was unable to trace the path of the ALJ's reasoning).

Also problematic is the ALJ's statement that plaintiff's claims are "not entirely credible." As the Seventh Circuit recently stressed, finding a claimant's testimony "not entirely credible," without any indication which statements are not credible and what exactly "not entirely" is meant to signify, tells the reviewing court little or nothing. See Spiva, 2010 WL 4923563, at *1; see also Martinez v. Astrue, No. 10-1957, slip op. at 2-3 (7th Cir. Jan. 19, 2011).

The ALJ did provide a few reasons, aside from the lack of medical support, for finding plaintiff not entirely credible. However, several of those reasons, which are objective rather than subjective in nature, have their own problems.

First, the ALJ cited what appear to be rather limited daily activities to discount plaintiff's testimony. The Seventh Circuit has repeatedly "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." See, e.g., Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006); see also Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009) ("For example, the ALJ mentions Stewart's ability to cook, clean, do laundry, and vacuum at her home, but those activities do not necessarily establish that a person is capable of engaging in substantial physical activity."). Nor did the ALJ explain the inconsistency between those activities and plaintiff's claims about her limitations. Stewart, 561 F.3d at 684 ("The ALJ should have explained any inconsistencies between Stewart's activities of daily living and the medical evidence."). In any event, the ALJ's recitation of plaintiff's daily activities lacks support in the

21

record.  She derived her contention that plaintiff engaged in "swimming, cooking, and walking" from Dr. Jella's records.  (Tr. at 373.)  However, this notation fell under "hobbies" in the "social history" section of Dr. Jella's note.  There appears to be no indication that plaintiff engaged in those activities after the alleged onset of disability.  Nor can I find any indication in the record that plaintiff "enjoyed swimming," as the ALJ stated.  In her pre-hearing activities questionnaire, plaintiff wrote that, aside from watching her child, she never did any of the activities listed on that form, including "hobbies."  (Tr. at 165.)  And caring for a child cannot be equated with the ability to work full-time.  See Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) ("Gentle must take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").

Second, the ALJ referred to plaintiff's alcohol consumption, but she failed to explain how plaintiff's failure to "confess" her drinking made her less credible.  There is no indication that the ALJ thought that, had plaintiff not been drinking, her symptoms would have been less severe or that she would have been able to work.

Third, the ALJ noted plaintiff's non-compliance with her diabetes treatment regimen, but she again failed to explain how it impacted plaintiff's credibility.  The ALJ did not suggest that, had plaintiff truly felt as bad as she claimed, she would have done a better job with her diet and insulin; nor did she suggest that, had plaintiff complied with treatment, should would not have felt pain or fatigue.  Nor did the ALJ consider any reasons for the non-compliance, as the regulations require.  See SSR 96-7p; SSR 82-59.  The record contains evidence that at times plaintiff could not see a doctor due to insurance problems.

Fourth, the ALJ noted that plaintiff's doctors had not recommended a cane, yet she used one anyway.  That is no reason to find her incredible.  See Parker, 597 F.3d at 922 ("Absurdly,

22

the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription; it had been suggested to the plaintiff by an occupational therapist."). As in Parker, plaintiff's use of an assistive device had been recommended by physical therapist, Milan Grbic (Tr. at 475), evidence the ALJ skipped.

Because the ALJ failed to follow the required two-step process, and because she relied on objective factors that lack support in the record and the case-law, the matter must be remanded for re-evaluation of plaintiff's credibility.

## B.    Physical Therapy Records

The ALJ will on remand also have to take a look at the physical therapy records from Milan Grbic. Although records from an "other source" such as a physical therapist may not be used to establish the existence of an impairment, they may be used to show impairment severity. See 20 C.F.R. § 404.1513. Indeed, the Seventh Circuit has stressed the importance of such records in evaluating the severity of "chronic" conditions, see Barrett v. Barnhart, 355 F.3d 1065, 1067-68 (7th Cir. 2004), such as those alleged by plaintiff here.

As set forth above, Milan Grbic's therapy records discuss plaintiff's back, neck, foot, and hand problems and resulting limitations. Specifically, Grbic noted that plaintiff used a cane, with which she could walk for just five minutes, and he suggested a walker. On examination, he noted that she bore weight more heavily on the right leg and could not unilaterally stand on the left. He further noted her reduced cervical and lumbar range of motion, as well as significantly reduced grip strength on the right. The ALJ mentioned none of these findings.[6]

_____

[6]Grbic's findings are supported, at least in part, by Dr. Tamayo's notation that plaintiff had pain on range of motion of the foot and was observed to limp on the left. (Tr. at 479.) The

Rather, her only mention of Grbic's records came in her statement that the therapist "reported no joint abnormalities and sensation remained intact." (Tr. at 12.) On remand, the ALJ must take a look at these records and see if they alter her analysis of plaintiff's alleged physical impairments.[7]

## IV. CONCLUSION

On remand, the ALJ must, after considering the entire record, account for all of plaintiff's physical and mental impairments, severe and non-severe, in setting RFC. See Parker, 597 F.3d at 923. She will then have to reconsider her step four and five determinations. Should the ALJ conclude that plaintiff can return to past work, she must specify whether plaintiff can return to such work as she did it or as it is done generally in the national economy. See Nolen v. Sullivan, 939 F.2d 516, 519 (7th Cir. 1991); Strittmatter v. Schweiker, 729 F.2d 507, 509 (7th Cir. 1984).

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g),

---

ALJ appeared to discount any ambulation problems because Drs. Marquez, Tamayo, and Pifel imposed no limitations on walking. (Tr. at 12.) However, it does not appear that these physicians were asked to opine on plaintiff's ability to walk. Similarly, the ALJ's statement that Dr. Pifel found nothing wrong with plaintiff's right hand (Tr. at 12) adds little since Dr. Pifel was asked to examine plaintiff's left shoulder.

[7]Plaintiff also challenges the ALJ's conclusion that her depression was not severe. The Commissioner does not in his brief attempt to defend this finding. I will therefore direct that the ALJ on remand take another look at this issue as well.

sentence four.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of January, 2011.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge